# Exhibit A



## SALES REPRESENTATIVE EMPLOYMENT AGREEMENT

THIS SALES REPRESENTATIVE EMPLOYMENT AGREEMENT, ("Agreement") is entered into this 30th day of October, 2015 between *Riddell, Inc.*, an Illinois corporation having its principal place of business at 9801 W. Higgins Rd., Rosemont, IL ("Riddell" or the "Company") and Brad Horstmann (the "Sales Representative" or "Representative").

As discussed with you, Riddell desires to offer continued employment to you, the Representative, in your position as a Kollege Town Sales Representative, and you, the Representative, accepts such continued employment, upon the terms, covenants and conditions set forth in this Agreement. Below explains Riddell's offer to you for the exempt salaried position of Kollege Town Sales Representative. Your start date with Riddell will be effective upon signature of this Agreement.

In consideration of the mutual promises and covenants contained in this Agreement, the receipt, adequacy and sufficiency of which is hereby acknowledged, the Company and Representative hereby agree as follows:

1. <u>Employment.</u> Riddell hereby employs Representative to act for Riddell as a sales representative for the sale of athletic apparel in accordance with the terms and conditions of this Agreement.

2. <u>Employment Relationship.</u> During the term hereof, Representative shall be an employee of Riddell.

3. <u>Duties and Responsibilities of Representative.</u>

    3.1 In performing obligations under this Agreement, Representative will not make any representations or give any warranties or guarantees to any person with respect to athletic apparel or related services, other than those representations, warranties or guarantees that Riddell has specifically authorized and as set forth in writing.

    3.2 Representative shall attend meetings as reasonably required by Riddell, at Riddell's expense.

    3.3 Representative shall report to and be directly responsible to Kollege Town's management.

    3.4 The responsibilities of the position are as we have discussed, and Riddell reserves the right to modify the responsibilities / requirements of the position at Riddell's discretion, at any time.

4. <u>Orders, Billings and Collections.</u> The scope of this Agreement includes all orders for athletic apparel sales received by Riddell through or from Representative.



5. Compensation

    5.1 Base Compensation. Your base compensation will be an annual salary of $105,500 with pay periods every two weeks. The Company reserves the right to change to a semi-monthly payroll in the future, with no impact to your base pay.

    5.2 Car Allowance. Your car allowance will be an annual amount of $4,500 paid at $375 per month in the first pay period of each month.

    5.3 Growth Incentive. You will be eligible for participation in the Growth Incentive at a level equal to 1% of the total Growth Incentive payout (SEE EXHIBIT A).

    5.4 Bonus Program. You will be eligible to participate in Riddell's Bonus Program at a level equal to 10% of your base salary upon achievement of specific Company objectives (to be determined by Riddell management annually).

6. Benefits. Employee will be eligible to participate in the employee benefit plans offered to employees of BRG Sports. This includes continuation of medical and dental benefits per existing Kollege Town plans, with Sixty-Five Percent (65%) employer contributions by Company, effective immediately. Effective January 1st, 2016 Employee will be eligible to participate in BRG Sports' benefits including life, disability and 401(k) plans. BRG Sports' 401(k) plan features a rollover provision that will allow you to immediately rollover any 401(k) funds that you may have from past employers into the BRG Sports Plan.

    The Company reserves the right to change such benefits so long as such changes apply to all similarly situated classes of participants. Likewise, the medical plan offered to former employees of Kollege Town is subject to change.

7. Confidentiality and Proprietary Interest Covenants.

    7.1 Covenant Not to Disclose. Representative represents to the Company that he will not at any time during his employment or at any time following the termination of said employment for any reason (including resignation), directly or indirectly, either individually or as an agent, employee, partner, member, manager, shareholder, officer, director or consultant/independent contractor, or in any other capacity, use or disclose, or cause or allow to be used or disclosed, any Confidential Information (as defined in Section 7.2 below) of the Company acquired by the Representative at any time, and regardless of the fact that Representative may have participated in the discovery or development of such Confidential

# Riddell

Information. Nothing in this Section 7 shall be interpreted to prohibit Representative from using the Confidential Information of the Company in the performance of his duties while employed by the Company.

7.2 Definition of Confidential Information. "Confidential Information" shall mean any data or information relating to the Company, its products or services, which is proprietary, not generally known by the public and which is the subject of reasonable efforts to maintain its secrecy. Confidential Information shall include, but not be limited to, the following: (1) customer records, names of vendors, vendor discounts and cost information, profit and performance reports, prices of products, selling and pricing procedures and techniques, and financing methods of the Company; (2) customer lists or database and information pertaining to identities of the customers, their special demands, and their past, current and anticipated requirements for the products or services of the Company; (3) specifications, manufacturing formulas, information relative to product development or enhancement, techniques, manuals and all other information pertaining to products or services of the Company, or of others for which the Company has assumed an obligation of confidentiality; (4) business plans and strategic objectives of the Company; (5) information concerning financial performance, accounting records, financial statements, proposed budgets and financing plans of the Company; (6) information regarding share ownership, capital contributions and capital accounts of shareholders; and (7) information relating to potential mergers, acquisitions, strategic business combinations or joint ventures with any third party. Even if a document has not been marked "Confidential," Representative shall treat the document and its contents as Confidential Information if Representative has been told or otherwise knows or reasonably should know the document and its contents are confidential. Representative further covenants and agrees that he shall retain all such knowledge and information which he shall acquire or develop respecting such Confidential Information in trust for the sole benefit of the Company and its successors and assigns.

7.3 Non-Solicitation.

(a) Non-Solicitation of Customers. Representative hereby agrees that for a period of eighteen (18) months following the resignation or termination of his employment for any reason, he will not, directly or indirectly and in any way, contact, interfere, solicit on behalf of another, entice or take away, or contract with any Restricted Customer. "Restricted Customer" shall be defined as any one of the following: (i) a current client or customer of the Company with whom Representative has developed a business relationship or had substantial business contact as a result of his employment with the Company; (ii) a customer of the Company to whom the Company has made sales in the past twelve (12) months and with for whom Representative was a primary or key contact; or (iii) a prospective customer with whom

# Riddell

Representative has been actively discussing, on behalf of the Company, a potential business relationship.

(b) Non-Solicitation of Employees. Representative hereby agrees that for a period of eighteen (18) months following the resignation or termination of his employment for any reason, he will not, directly or indirectly and in any way, induce, encourage, solicit, entice, take away, or procure any person who is a Restricted Employee to leave such employment with the Company. "Restricted Employee" shall be defined as any employee of the Company on or within six (6) months of Representative's resignation or termination date who has or had substantial responsibility with the Company for sales, account management, customer relationships or executive management.

7.4 Non-Interference with Business Relationships. Representative hereby agrees that for a period of eighteen (18) months following the resignation or termination of his employment for any reason, he will not, directly or indirectly and in any way, contact, solicit or entice any vendor, wholesalers, joint venturers or business partners.

7.5 Non-Competition. Representative hereby agrees that for a period of eighteen (18) months following the resignation or termination of his employment for any reason, Representative will not engage directly or indirectly (as an employee, contractor, owner, or agent), in sales, sales management or strategic marketing related activities competitive with the Company Business, within the geographic area assigned to the Representative by the Company during the last year of his employment. "Company Business" shall be defined as any business that competes with the Company in the sales, distribution, and reconditioning of football equipment and athletic apparel.

7.6 Consideration. In consideration for these Covenants and for acceptance of the terms herein, Riddell agrees to the continued employment of the Representative in his capacity as a Kollege Town Sales Representative.

8. Term.

   8.1 Notwithstanding any other provision herein, the Agreement shall terminate automatically, immediately and without prior notice upon Representative's death or disability. (For the purpose of this agreement, disability shall be defined as a short or long term medical condition that would otherwise qualify the Representative for disability benefits per Riddell health and welfare programs).

   8.2 Notwithstanding any other provision of this Agreement, Riddell may immediately terminate this Agreement at any time and without prior demand

or notice for Good Cause. Good Cause shall include the following: (i) Representative breaches this Agreement or fails to perform any of Representative's material obligations, duties, promises or representations under this Agreement; or (ii) Representative commits any crime against Corporation, or against any of the Officers, Directors, Employees, customers or agents of Corporation; or (iii) Representative commits any other crime (except a minor traffic violation) or any act involving fraud, dishonesty or moral turpitude.

8.3 Notwithstanding any other provision herein, Representative may terminate this Agreement at any time and without prior notice or demand upon Riddell's breach of this Agreement or violation of any of its obligations, duties, promises or representations under this Agreement.

9. Governing Laws and Disputes. This Agreement, and the performance or breach under this Agreement, is governed by and interpreted both as to procedural and substantive matters in accordance with the applicable laws of the State of Illinois. The Representative consents to the jurisdiction of the courts of Illinois and the application of Illinois law with respect to any matter or thing arising out of this Agreement. In the event of a breach or a threatened breach of this Agreement by the Representative, the Representative acknowledges that Riddell will face irreparable injury which may be difficult to calculate in dollar terms and that Riddell shall be entitled, in addition to remedies otherwise available at law or in equity, to temporary restraining orders and preliminary injunctions and final injunctions enjoining such breach or threatened breach. In the event Riddell shall successfully enforce any part of this Agreement through legal proceedings, the Representative agrees to pay Riddell all costs and attorneys' fees reasonably incurred by Riddell in connection therewith.

10. Rights of Assignment. No portion of this Agreement or any right or obligation under this Agreement can be transferred or assigned, in whole or in part, whether by operation of law or otherwise, by either party without the prior written consent of the other party, except that Riddell may freely transfer and assign its rights and obligations under this Agreement to any affiliate(s), successor organizations(s) or a wholly owned subsidiary of Riddell provided that Riddell guarantees of the obligations of such subsidiaries in form and substance reasonably satisfactory to Representative.

11. Waiver. The failure of either party to insist upon a strict or timely performance of any of the terms and provisions of this Agreement is not deemed a waiver of any other rights or remedies that the party may have or of any subsequent breach or default in the same or other terms or provisions of this Agreement.

12. Entire Agreement. This Agreement, and any written amendments to this Agreement, constitutes the complete and exclusive agreement between the Parties. Further, this Agreement supersedes and replaces any and all previous employment agreements, negotiations, representations, understandings you have (or may have had) as of the

# Riddell

date of your signature on this Agreement. No change in, addition to or waiver of the terms and provisions of this Agreement is binding upon either party unless in writing and approved by a duly authorized officer or representative of each of the Parties to this Agreement.

13. **Notice.** Any notice or delivery by either party to the other shall be in writing and shall be sent by facsimile, mail or delivered in person at the respective addresses set forth at the head of this Agreement, or such address as may be designated written notice in accordance with this Article 13. All notices and other communications given or made pursuant to this Agreement shall be deemed given and effective upon (i) the third day after mailing, if sent by registered or certified mail, return receipt requested, (ii) upon delivery if sent by hand delivery, (iii) when received, if sent by prepaid overnight carrier with a record of receipt, or (iv) the first day after transmission, if sent by facsimile.

14. **Unfair Competition.** Representative covenants that he will not engage in any deceptive, misleading, illegal or unethical business acts or practices with regard to Representative's performance under this Agreement.

15. **Counterparts.** This Agreement may be signed in any number of counterparts with the same effect as if the Parties had executed a single document.

16. **Performance.** Performance and salary reviews are conducted annually. Your first performance review will be in or around March 2016.

We understand you may have knowledge of proprietary information or trade secrets belonging to previous companies for whom you have worked. It is a condition of this Agreement that you will not disclose any proprietary information or trade secrets from previous employers, and by signing this Agreement, you agree not to do so. You should notify us immediately if you are currently subject to a non-compete with any current (prior) employers

Continued employment is contingent upon your ability to legally drive. You are also required to maintain personal auto insurance. Maintaining an acceptable driving record is a condition of employment while your role requires driving a vehicle as primary function of your job.

This Agreement is contingent upon your agreeing to and signing the Riddell standard "Confidentiality Agreement" and Employee Handbook.

As a courtesy to members of Riddell with whom you will be working, we request that you do not update your status on Facebook, LinkedIn or any other social media until after your start date and our internal communication of your arrival. If you have any questions, please speak to your manager.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

_____
SALES REPRESENTATIVE

Print Name: BRAD HORSTMANN

Date: 10/29/15


RIDDELL, INC.

By: _____

Its: CFO, COO

Date: 10/30/15



## Exhibit A - Growth Incentive

Revenue Thresholds in a given LTM Period (defined below) within five (5) years of the date hereof (the "Term"). Notwithstanding the foregoing, Threshold Payouts will only be made for the LTM Revenue Thresholds set forth herein if the Reported Margin Percentage (defined below) during that LTM Period is Thirty-Five Percent (35%) or greater.

The Growth Incentive is as follows:

| LTM Revenue Threshold* | % of Growth | Threshold Payout |
|---|---|---|
| $30,000,000 | 3% | $450,000 |
| $50,000,000 | 4% | $800,000 |
| $70,000,000 | 6% | $1,200,000 |
| $85,000,000 | 6% | $900,000 |
| $100,000,000 | 6% | $900,000 |

*Revenue figures for the LTM Revenue Threshold are revenues per LTM Period.

The Threshold Payout associated with each LTM Revenue Threshold shall only be paid once. For example, after the Threshold Payout is made for reaching the $30,000,000 LTM Revenue Threshold, no further Threshold Payouts shall be paid until the $50,000,000 LTM Revenue Threshold is reached.

Employees are eligible for the share of the Threshold Payout providing that they are employees of Riddell, Inc., the Company or an Affiliate on the date of payment (within one month following LTM Revenue Threshold attainment).

If any employee is no longer eligible, their portion of the Growth Incentive will be allocated back to existing eligible participants on a pro-rata basis in order to maintain the total Threshold Payout.

"LTM Period" shall mean any consecutive twelve calendar month period during the Term; provided, that any months used in the calculation of a Threshold Payout associated with the achievement of a LTM Revenue Threshold cannot be counted into the LTM Period used to calculate a subsequent LTM Revenue Threshold. For example, if the LTM Revenue Threshold of $30,000,000 is achieved in the LTM Period from January 2016 – December 2016 then the LTM Period for purposes of counting a subsequent LTM Revenue Threshold can start no earlier than January 2017.

"Reported Margin Percentage" shall mean the percentage calculated by multiplying 100 by the fraction, the numerator of which is the Variable Margin of the Company before any applicable commissions over a given LTM Period and the denominator of which is the revenue of the Company over a given LTM Period.

"Variable Margin" means sales net of allowances and returns minus (a) the cost of goods sold (including but not limited to material, labor and manufacturing variances) and (b) transportation and facility rent expenses as such expenses are represented and consistent with operations of the Business as of the Closing Date, which support the Company's manufacturing and distribution activities.